GEORGE A. HALSEY

v.

THE RAPID TRANSIT STREET RAILWAY COMPANY.

1. The ownership in land over which a street has been laid is, for all substantial purposes, in the public, although the owner retains the naked fee, and the right of the public to use it for public travel is the primary and superior right.

2. Land taken for a street is taken for all time, and compensation is made once for all, and by the taking the public acquire the right to use it for travel, not only by such means as were in use when the land was acquired, but by such other means as new wants and the improvements of the age may render necessary.

3. Any use of a street which is limited to an exercise of the right of passage, and which is confined to a mere use of the public easement, whether it be by old methods or new, and which does not, in any substantial degree, destroy the street as a means of free passage, common to all the people, is a legitimate use and within the purposes for which the public acquired the land.

Halsey v. Rapid Transit Street Railway Co.

4. An individual cannot maintain an action for injury caused by obstructing a highway unless he suffers some private, direct and material damage beyond the public at large, as well as damage otherwise irreparable. Mere diminution of the value of his property by the nuisance, without irreparable mischief, will not furnish any foundation for equitable relief.

5. A preliminary injunction will not be granted where either the complainant's right is in doubt, or where the damage which will result from an invasion of his right is not irreparable.

6. An abutting owner is allowed to exercise privileges on the sidewalk, in front of his premises, which he may not exercise elsewhere in the street, because he is chargeable with the whole expense of maintaining the sidewalk.

7. When not restrained by ordinance or otherwise, an abutter may use the highway in front of his premises for loading and unloading goods, for vaults and chutes, for awnings and shade trees, but only on condition that he does not interfere with the safety of public travel. The public right is paramount and that of the abutter subordinate.

8. Where a corporation is authorized by a general grant to exercise a franchise or to carry on a business, and the grant contains no words either defining or limiting the powers which the corporation may exercise, it will take, by implication, all such powers as are reasonably necessary to enable it to accomplish the purposes of its creation.

9. Where no method is prescribed by law in which a municipality shall exercise its powers, but it is left free to determine the method for itself, it may act either by resolution or ordinance.

10. Placing poles in the middle of the street, for the purpose of using electricity for street car propulsion, does not impose a new servitude on the land in the street—the poles facilitate the use of the street as a public way.

11. The question whether a new method of using a street for public travel results in the imposition of an additional burthen on the land or not, must be determined by the use which the new method makes of the street, and not by the motive power which it employs in such use.

12. Lamp-posts and other appropriate instruments may be lawfully erected in the streets of a city for the purpose of lighting them at night.

On application for an injunction, heard on bill and affidavits and answer and affidavits.

Mr. *John R. Emery* and Mr. *Frederic W. Stevens*, for the complainant.

Mr. *Chandler W. Riker* and Mr. *Theodore Runyon*, for the defendant.

VAN FLEET, V. C.

The complainant owns lands abutting on Kinney street and Belmont avenue, in the city of Newark. His lands have a frontage on Kinney street of two hundred and thirty-six feet and on Belmont avenue of about one hundred and thirty-three feet. His title extends to the middle of the street. The defendant is a street railway corporation. It was organized under a general statute approved April 6th, 1886, entitled "An act to provide for the incorporation of street railway companies and to regulate the same." *Rev. Sup. p. 363.* The defendant has laid two railroad tracks in Kinney street, and intends to. lay two others in Belmont avenue. One of those laid in Kinney street is on that part of the street in which the complainant owns the fee of the land. No claim is made that these tracks were put down without authority of law, or in violation of the complainant's rights. They are unquestionably lawful structures. They were put down by permission of the city authorities and under their supervision. The defendant intends to use electricity as the propelling power of its cars, and for the purpose of applying this force to the motors on its cars, it has, with the permission of the city authorities, erected three iron poles in the centre of Kinney street and strung wires thereon. The poles stand partly on the complainant's land. The erection of these poles and the use to which the defendant intends to apply them constitutes the only ground on which the complainant rests his right to the relief he asks. The bill describes these three poles as standing one hundred and eleven feet distant from each other, about twenty feet in height, ten inches by six in diameter at the base, set in a guard or frame, in the form of an inverted cup, which at its base is twenty-two inches by eighteen in diameter. To what depth below the surface the poles have been sunk, or what are the dimensions of the part extending below the surface, or whether they have been put in the earth at all or simply set up on the surface, are matters, in respect to which, neither the bill nor the answer gives any information whatever. Both pleadings, however, agree that the poles stand in the centre of the street, so that it is an undisputed fact in the case, that the whole extent of the

land of the complainant occupied by either the poles or the guards, are three spaces of nine inches by eleven, and that the spaces so occupied are in that part of the street where the right of the public is, for purposes of travel, paramount as against the complainant. The poles were erected without the consent of the complainant and without compensation to him. No compensation is intended to be made. The complainant insists that the erection of the poles imposed a new and additional servitude on his land in the street; in other words, that his land, by the erection of the poles, has been appropriated to a purpose for which the public have no right to use it. If his insistment is true, it is obvious that his constitutional rights have been violated, for one of the most important guaranties of the constitution is, that private property shall not be taken for public use without just compensation. It is likewise obvious that if the complainant's constitutional rights have been invaded by the erection of the poles, he is entitled to protection by injunction, for that is the only remedy which will adequately redress his wrong. It is the only judicial means by which that which has been taken from a citizen in violation of the rights secured to him by the constitution can be effectually restored to him. The complainant asks that the defendant may be enjoined from erecting poles on his land in Belmont avenue, and also from making any use of those erected on his land in Kinney street.

The question on which the decision of the case must turn is this: Has the complainant's land in the street been appropriated to a purpose for which the public have no right to use it? It is of the first importance in discussing this question to keep constantly before the mind the fact that the *locus in quo* is a public highway, where the public right of free passage, common to all the people, is the primary and superior right. The complainant has a right in the same land. He holds the fee subject to the public easement. But his right is subordinate to that of the public, and so insignificant, when contrasted with that of the public, that it has been declared to be practically without the least beneficial interest. Mr. Justice Depue, in pronouncing the judgment of the court of errors and appeals in *Hoboken Land and Improve-*

*ment Co.* v. *Hoboken, 7 Vr. 540, 581,* said : "With respect to lands over which streets have been laid, the ownership for all substantial purposes is in the public. Nothing remains in the original proprietor but the naked fee, which on the assertion of the public right is divested of all beneficial interest." This view was subsequently enforced by the same court in *Sullivan* v. *North Hudson R. R. Co., 22 Vr. 518, 543.* Both the nature and extent of the public right are well defined. Lands taken for streets are taken for all time, and if taken upon compensation, compensation is made to the owner once for all. His compensation is awarded on the basis that he is to be deprived perpetually of his land. The lands are acquired for the purpose of providing a means of free passage, common to all the people, and consequently may be rightfully used in any way that will subserve that purpose. By the taking the public acquire a right of free passage over every part of the land, not only by the means in use when the lands were taken, but by such other means as the improvements of the age, and new wants, arising out of an increase in population or an enlargement of business, may render necessary. It is perfectly consistent with the purposes for which streets are acquired' that the public authorities should adapt them, in their use, to the improvements and conveniences of the age. *Morris and Essex R. R. Co.* v. *Newark, 2 Stock. 352, 357.* This is the principle on which it has been held that a street railway, operated by animal power, does not impose a new servitude on the land in the street, but is, on the contrary, a legitimate exercise of the right of public passage. Such use, though it may be a new and improved use, still is just such a use as comes precisely within the purposes for which the public acquired the land. Chancellor Williamson, speaking on this subject in the case last cited, said in substance (*p. 558*), the authority to use a public highway for the purpose of a railroad, retaining the use of such highway for all ordinary purposes, subject only to the inconvenience of the railroad, is not such a taking of private property from the owner of the fee of the adjacent land as is prohibited by the constitution. The easement of the highway is in the public, although the fee is technically in the adjacent owner. It is the easement only which is

appropriated, and no right of the owner is interfered with. While the street is preserved as a common public highway, the use of it does not belong to the owner of the land abutting on it any more than it does to any other individual of the community. The legislature, therefore, does not, by permitting a railroad company to use the highway in common with the public, take away from the land-owner anything that belongs to him. It is not a misappropriation of the way. It is used, in addition to the ordinary mode, in an improved mode for the people to pass and repass. This exposition of the law, so far as it concerns horse railroads, has been approved as correct in all subsequent cases. As I understand the adjudications of this state, this principle must be considered authoritatively established, that any use of a street which is limited to an exercise of the right of public passage, and which is confined to a mere use of the public easement, whether it be by old methods or new, and which does not tend, in any substantial respect, to destroy the street as a means of free passage, common to all the people, is perfectly legitimate. Such use invades no right of the abutting owners; it takes nothing from them which the law reserved to the original proprietor when his land was taken; it is simply a user of a right already fully vested in the public, and consequently, by its exercise, nothing is taken from the abutting owners which can be made the basis of additional compensation.

It is not denied that the railway tracks which the defendant has laid on the complainant's land were placed there by authority of law, nor that the defendant has a legal right to use them in the transportation of passengers, but the complainant's claim is this: that by the erection of the three poles, his land in the street has been appropriated to a use entirely outside of the public easement, and that it follows, as a necessary legal consequence, that such use constitutes a wrongful taking of his property. Stated more briefly, his claim is, that the erection of the poles puts an additional servitude on his land, and attempts to give the public a right in his land which, as yet, has not been acquired, nor paid for. That the poles will, to a trifling extent, obstruct public travel and prevent infinitesimal parts of the street from being

used as a means of free passage, is a fact which cannot be denied, but there is nothing in this situation of affairs which entitles the complainant to the aid of a court of equity, unless it is made to appear that the nuisance thus created results in some substantial injury to him, different from that suffered by the public at large, and that the damage which he will sustain in consequence of the nuisance is irreparable in its character.  The rule on this subject is settled.  An individual has no right of action, in cases of nuisance created by obstructing a highway, unless he suffers some private, direct and material damage beyond the public at large, as well as damage otherwise irreparable.  Mere diminution of the value of the property of the party complaining, by the nuisance, without irreparable mischief, will not furnish any ·foundation for equitable relief.  *Morris and Essex R. R. Co.* v. *Prudden, 5 C. E. Gr. 530, 537.*  No irreparable damage is shown in this case; indeed, I think it may well be doubted whether a sufficient injury is shown to entitle the complainant to maintain a personal action in any court.  The bill avers the following facts: that the complainant's premises are used as a japannery, with a present entrance to them from Kinney street; that one of the poles in Kinney street stands about forty-five feet distant from the point of entrance, and that the pole, by reason of the slope of the street, makes the passage of wagons to the entrance more inconvenient than it would be if the pole was not there. Now, I am compelled to confess to an utter want of capacity to see how a pole, with a base of twenty-two inches by eighteen, standing in the middle of a street sixty feet wide, and distant forty-five feet from the point of entrance, can, to any appreciable extent, obstruct or impede the passage of a wagon over the street to the entrance, no matter what the slope of the street may be. It is true there is a very small space in the middle of the street over which a wagon approaching the entrance cannot pass, but it may pass on either side.  Besides, the distance of the pole from the entrance renders it very improbable, as it seems to me, that a wagon, in passing from the street to the entrance, would, if there was no pole there, pass over this space one time in fifty.  Certain it is, that even if it be true that the pole diminishes the complain-

Halsey v. Rapid Transit Street Railway Co.

ant's means of access to the entrance, the diminution is so insignificant as to lay no ground for relief in equity.

A doubt as to whether the complainant's land in the street has been appropriated to a purpose for which the public have no right to use, will, at this stage of the cause, be fatal to his claim to an injunction. In a case where the complainant's right is doubtful and no irreparable damage will result from the doing of the act which he seeks to have enjoined, a preliminary injunction should not be granted. *Hinchman* v. *Paterson Horse R. R. Co.*, *2 C. E. Gr. 75, 81.* The rule on this subject has recently been stated by the court of errors and appeals, in a form so lucid and imperative as to remove all doubt respecting the judgment which this court must pronounce on applications of the class just described. This is the form in which the rule is laid down: "It is impossible to emphasize too strongly the rule so often enforced in this court, that a preliminary injunction will not be allowed where either the complainant's right, which he seeks to have protected *in limine* by an interlocutory injunction, is in doubt, or where the injury which may result from the invasion of that right is not irreparable." *Hagerty* v. *Lee, 18 Stew. Eq. 255, 256.* The poles have been placed on that part of the complainant's land where, if their erection constitutes a legal injury at all, they will do the least possible harm. They have been placed on the edge of his boundary line, at a point where, so long as his land remains subject to the public easement, it is not possible for him to make any use whatever of the land. Had they been placed on the sidewalk in front of his premises, rights, growing out of a duty incumbent upon the abutting owner in respect to that part of the street, might have made it the duty of the court to consider questions not at all involved in this case. "A sidewalk," said Chief-Justice Beasley, in *Agens* v. *Newark, 8 Vr. 415, 423,* "has always, in the laws and usages of this state, been regarded as an appendage to, and a part of, the premises to which it is attached, and is so essential to the beneficial use of such premises, that its improvement may well be regarded as a burthen belonging to the ownership of the land, and the order or requisition for such an improvement as a police regulation. On this ground, I conceive

it to be quite legitimate to direct it to be put in order at the sole expense of the owner of the property to which it is subservient and indispensable." And Mr. Justice Dixon, in pronouncing the opinion of the supreme court in *Weller* v. *McCormick, 18 Vr. 397, 400,* said : " Probably in consideration of the peculiar privilege usually accorded to the owner to use the adjacent sidewalk for stoops, areas, chutes and other domestic and trade conveniences, he has been held chargeable with the whole expense of maintaining this portion of the road." These utterances show that there is a material distinction between the rights of an abutting owner in the sidewalk adjacent to his premises and those which he may exercise over the other part of the street. I entertain no doubt that that part of the street which has been set apart for public use by means of vehicles may be lawfully applied to uses which would be unlawful, as against the adjacent owner, if exercised, against his will, on the sidewalk which his money has paid for.

The question here, however, is, what are the rights of an adjacent owner in that part of the street in which he holds the naked fee, but which has been set apart, by municipal regulation, for public use by means of vehicles. Mr. Justice Haines, in speaking of his rights in an ordinary highway, not an urban way, said, in *Starr* v. *Camden and Atlantic R. R. Co., 4 Zab. 592, 597 :* " He may lay water pipes, gas or other pipes below the surface; may excavate for a vault, or dig for mining purposes, and use the soil in any other manner that does not interrupt the free passage over it." In a recent case, heard by the chief-justice and Justices Dixon and Reed, Mr. Justice Dixon, in pronouncing the opinion of the court, said, in substance, that an abutter may use the highway in front of his premises, when not restrained by positive enactment, for loading and unloading goods, for vaults and chutes, for awnings, shade trees, &c., but only on condition that he does not unreasonably interfere with the safety of the highway for public travel. The public right is paramount, and includes the right to have the street safe for travel. That of the abutting owner is subordinate. *Weller* v. *McCormick, 23 Vr. 470.* Some of the rights mentioned in these definitions cannot,

as is obvious, be exercised in that part of the street where the poles stand. An awning could not lawfully be put there, nor a chute, nor shade trees. Nor could the privilege of loading and unloading goods be exercised at that point either rightfully or advantageously. As to the other rights mentioned, namely, to lay pipes, to construct a vault and to mine, there is not, as the case now stands, a word of proof before the court going to show that the poles do or will impair these rights in the slightest degree, or prevent the complainant from exercising them to the fullest extent.

The court might very properly, I think, at this point deny the complainant's application, on the ground that he has shown no such injury as entitles him to relief by injunction, but as this course would leave the principal question of the case undecided, it should not, in my judgment, be adopted. The litigants, I think, are entitled to a decision on the question, whether or not the complainant's land in the street has been appropriated, by the erection of the poles, to a use not within the public easement. That is the question which received the principal attention of counsel on the argument, and which has occupied the greater part of the time devoted to the consideration of the case.

The right of the defendant to use electricity as its motive power is clear. The defendant was organized under a general statute, authorizing seven or more persons to associate themselves together, by articles in writing, for the purpose of forming a corporation to construct, maintain and operate a street railway for the transportation of passengers. *Rev. Sup. p. 363.* The motive power to be used by corporations formed under this statute is in no way limited or defined; the statute does not say that they shall use animal, mechanical or chemical power; it says nothing at all on the subject of power; hence, under the general grant of power to maintain and operate a street railway, it would seem to be clear, that a corporation formed under this statute, takes, by necessary and unavoidable implication, a right to use any force, in the propulsion of its cars, that may be fit and appropriate to that end, and which does not prevent that part of the public which desires to use the street, according to other customary

methods, from having the free and safe use thereof. While the rule is elementary that public grants are to be strictly construed, still it is also well established, that where a corporation is authorized, by a general grant, to exercise a franchise or to carry on a business, and the grant contains no words either defining or limiting the powers which the corporation may exercise, it will take, by implication, all such powers as are reasonably necessary to enable it to accomplish the purposes of its creation. I am, therefore, of opinion, that if there was no other legislation on this subject than that just mentioned, and that it was made to appear that electricity could be used for the propulsion of street cars without preventing the free and safe use of the street by other means of transportation, the defendant would, by force of the statute under which it was organized, have a right to use electricity as its motive power. But there is other legislation on this subject. Just a month prior to the approval of the statute under which the defendant was organized, another statute was passed, which declares that any street railway company in this state may use electric motors as the propelling power of its cars instead of horses; provided, it shall first obtain the consent of the proper municipal authority to use such motors. *Rev. Sup. p. 369 § 30.* On the argument it was contended that the legislature meant to confine the grant made by this statute to such corporations as were in existence when the statute was passed and to exclude such as should subsequently be created. This view was not pressed with much vigor, nor without the expression of doubt. I cannot adopt it. On the contrary, it seems to me, that when the two statutes are considered together, as they must be—for each forms a part of the same legislative scheme and both were enacted at the same session—it is made perfectly plain that the legislature meant that corporations formed under the later statute should have the benefit of the grant made by the earlier. The grant, it will be observed, is not limited to such street railroad companies as were in existence when the statute was passed, or as had theretofore been created, but is made to any street railroad company in this state. The grant is general, and was obviously designed to operate in favor of all corporations of the kind de-

scribed, whether existing at its date or subsequently created. This construction puts the legislation under consideration in harmony with that provision of the constitution which prohibits the granting of any exclusive privilege to a corporation and commands that corporate powers, of every nature, shall be conferred by general laws.

By the terms of the statute just construed, no street railway corporation can use electricity as its motive power until it has obtained the consent of the proper municipal authority. The defendant has such consent. It was given by resolution adopted by the common council and approved by the mayor. The complainant contends that consent cannot be given by resolution, and insists that the municipality, in such a matter, can only act by ordinance. But the rule, according to the adjudged cases, is firmly settled the other way, and may be stated as follows: Where a statute commits the decision of a matter to the common council or other legislative body of a city, and is silent as to the method in which the decision shall be made, it may be made either by resolution or ordinance. Or—to state the rule in another form—where no method is prescribed in which a municipality shall exercise its power, but it is left free to determine the method for itself, it may act either by resolution or ordinance. One method is just as effectual in point of law as the other. *State* v. *Jersey City, 3 Dutch. 493; City of Burlington* v. *Dennison, 13 Vr. 165; Butler* v. *Passaic, 15 Vr. 171.*

In view of the legislation and the action of the city authorities just discussed, it would seem to be clear, that the right of the defendant to use electricity as its motive power, stands, at least so far as the public are concerned, on a sure foundation. The poles and wires are to be used to apply electricity to the motors on the cars. They form a part of what is called the overhead system. In the present state of the art, they constitute a part of the best, if not the only means, by which electricity can be successfully used for street car propulsion. The proof on this point is decisive. Thomas A. Edison is perhaps the highest authority on this subject in this country. He says, in an affidavit annexed to the defendant's answer, that the only method of applying elec-

tricity for street car propulsion which, up to the present time, has proved successful, electrically and commercially, is what is known in the art as the overhead system, whereby electricity is supplied to the motors on the cars from wires suspended above the cars. Other electricians say the same thing. The proofs also show, that there are over two hundred electric street railways in the United States either in operation or in course of construction, and that of those in operation nearly all use the overhead system. That, according to the proofs, is the best system, and the one in general use, and the only one which, as yet, has proved successful. The facts just stated are in no way controverted, so as the proofs now stand, the court is bound to declare, as an established fact, that the poles and wires are, in the present state of the electric art, necessary to the successful operation of the defendant's railway by electricity. The poles and wires are to be used as helps to the public in exercising their right of passage over the street. They form part of the means by which a new power, to be used in the place of animal power, is to be supplied for the propulsion of street cars, and they have been placed in the street to facilitate its use as a public way and thus add to its utility and convenience. The whole matter may be summed up in a single sentence: the poles and wires have been placed in the street to aid the public in exercising their right of free passage over the street. That being so, it seems to me to be clear beyond question, that the poles and wires do not impose a new burthen on the land, but must, on the contrary, be regarded, both in law and reason, as legitimate accessories to the use of the land for the very purposes for which it was acquired. They are to be used for the propulsion of street cars, and the right of the public to use the streets by means of street cars, without making compensation to the owners of the naked fee in the street, is now so thoroughly settled as to be no longer open to debate. It would seem then to be entirely certain, that the occupation of the street by the poles and wires, takes nothing from the complainant which the law reserved to the original proprietor when the public easement was acquired. This view is in strict accord with the uniform current of judicial opinion on

this subject. The question presented here for judgment has already been considered by the supreme court of Rhode Island in *Taggart* v. *Newport Street Railway Co., 19 Atl. Rep. 326,* and by the circuit court of the United States for the eastern district of Arkansas in *Williams* v. *City Electric Street Railway Co., 41 Fed. Rep. 556,* and by local courts in Kentucky, Ohio and Indiana, and in each instance the decision has been that the placing of the poles and wires in the street, for the purpose of propelling street cars by electricity, did not impose a new servitude on the land, nor appropriate the land to a use not within the public easement. The decision in these cases was placed upon this manifestly just principle.: that the question, whether a new method of using a street for public travel results in the imposition of an additional burthen on the land or not, must be determined by the use which the new method makes of the street, and not by the motive power which it employs in such use. The use is the test and not the motive power. And this principle exhibits, in a very clear light, the reason why it has been held that the placing of telegraph and telephone poles in the street imposes an additional servitude on the land. They are not placed in the street to aid the public in exercising their right of free passage, nor to facilitate the use of the street as a public way, but to aid in the transmission of intelligence. Although our public highways have always been used for carrying the mails and for the promotion of other like means of communication, yet the use of them for a like purpose, by means of the telegraph and telephone, differs so essentially, in every material respect, from their general and ordinary uses, that the general current of judicial authority has declared that it was not within the public easement. Massachusetts has, however, by a divided court, held otherwise. *Pierce* v. *Drew, 136 Mass. 75.*

The authority on which the complainant principally relies to maintain his right to an injunction, is the judgment of the court of errors and appeals in *Wright* v. *Carter.* That case arose out of the following facts : The legislature authorized a turnpike company to construct its turnpike on a public highway, but directed that the highway should be vacated before the construc-

tion of the turnpike was commenced. The object of this direction was not to discharge the land from the public easement, but to relieve the public from the duty of keeping the highway in a proper state of repair and to impose that duty on the turnpike company. The highway was vacated and the turnpike constructed. After the turnpike was completed, the company built a house for its gate-keeper within the limits of the highway and on land in which the plaintiff held the naked fee. The plaintiff then brought ejectment. His action was based on the notion that the vacation of the highway discharged his land from the public easement, and that after the easement had once been discharged, it was not within the power of the legislature to reimpose it without making provision that compensation should be made. He also insisted, that even if the public easement still endured, a new servitude had been imposed on his land by the erection of the house. The supreme court held both his positions to be unsound and gave judgment for the defendant. *Wright* v. *Carter, 3 Dutch. 76.* This judgment was carried to the court of errors and appeals and there reversed. No opinion appears to have been written, but the ground of the reversal is given by Chief-Justice Beasley in *State* v. *Laverack, 5 Vr. 201.* On page 208 he says: "I have always understood that the view of the supreme court, touching the legislative right to convert the public highway into a turnpike was concurred in by the higher court, and that the point of dissent was with regard to the privilege which had been sanctioned of putting the toll-house on the property of the land-owner." The chief-justice also expresses it as his judgment, that the erection of the house "was an invasion of the property of the land-owner, because to this extent it put an additional servitude upon his property. While the land was a public highway such a building could not have been erected; consequently, when such land was converted into a turnpike, to authorize such an erection was to give to the public a new use in such land." *Wright* v. *Carter* and the case under consideration differ, it will be noticed, in every essential feature except that they both relate to a public way. The house could, under no possible condition of circumstances, be used as an instrument to

aid the public in exercising their right of free passage. It was not erected for any such purpose, but, on the contrary, with the obvious design to withdraw permanently and entirely from public use, as a means of passage, that part of the way which it covered. The poles and wires have been erected for an entirely different purpose; in fact, for a purpose which is the exact opposite of that just stated. They are designed to facilitate the use of the streets as means of public passage, and thus increase their utility and convenience to the public. But I do not believe it is possible to imagine any condition of facts which would make it lawful to erect a building, to be used as a dwelling, in a public way. Such use of the land would undoubtedly be entirely foreign to the purposes for which it was acquired. There can, however, be no doubt, I think, that erections may be lawfully made in the streets of a city for the purpose of lighting them. They must be lighted at night to make their use safe and convenient and to prevent lawlessness and crime. By the charter of Newark power is given to its governing body, by express words, to light the streets, parks and other public places. I have no doubt that in virtue of this power the city has the right to erect poles in the street just where the poles in question are. The poles in question are in fact to be used for the purpose of lighting the street. One of the conditions on which the city gave its consent to the erection of the poles is, that the defendant shall place on every other pole a group of five incandescent lights, of sixteen candle power each, and furnish such light every night. This use of the poles and wires would, in my judgment, legalize their erection, but this is not their primary use. They were erected primarily and principally to facilitate the use of the street and add to its convenience as a public way, and it is upon this ground that I think it should be declared that their presence in the street invades no right of the complainant.

The averment that the use of electricity by the defendant, as its propelling power, will render the street so extremely dangerous as practically to destroy it as a public way for any other use than that which the defendant may make of it, is not supported by the proofs; on the contrary, I think it is very clearly shown,

that an electric current of the volume the defendant will use, may be used with entire safety to everybody.

The complainant's application must be denied, with costs.